# United States Court of Appeals
## For the Eighth Circuit

_____

No. 25-3248

_____

Joaquin Herrera Avila

*Petitioner - Appellee*

v.

Pamela Bondi, Attorney General; Markwayne Mullin,[1] Secretary, U.S. Department of Homeland Security; Todd M. Lyons, Acting Director of Immigration and Customs Enforcement; Sirce E. Owen, Acting Director for Executive Office for Immigration Review; Peter B. Berg, Director, Ft. Snelling Field Office Immigration and Customs Enforcement

*Respondents - Appellants*

Ryan Shea, Sheriff of Freeborn County

*Respondent*

Immigration & Customs Enforcement; Executive Office for Immigration Review; Department of Homeland Security; Samuel Olson, Director, St. Paul Field Office Immigration and Customs Enforcement

*Respondents - Appellants*

-------------------------------

American Immigration Council; American Immigration Lawyers Association; Immigration Law Scholars

*Amici on Behalf of Appellee(s)*

_____

---

[1]Secretary Mullin is automatically substituted for his predecessor under Federal Rule of Appellate Procedure 43(c)(2).

SHEPHERD, Circuit Judge.

Joaquin Herrera Avila, a native and citizen of Mexico, was apprehended in Minneapolis in August 2025 for lacking legal documents authorizing his admission into the United States. The Department of Homeland Security (DHS) detained Avila without bond and brought removal proceedings against him. The district court granted Avila's petition for a writ of habeas corpus, and the Government now appeals. Having jurisdiction under 28 U.S.C. §§ 1291 and 2253(a), we reverse and remand for proceedings consistent with this opinion.

I.

Avila illegally entered the United States without inspection or admission in 2006 and again in 2016. See, e.g., 8 U.S.C. § 1325(a) (making it illegal to "enter the United States at any time or place other than as designated by immigration officers" and imposing a term of imprisonment of up to six months for the first offense and up to two years for subsequent offenses). In August 2025, DHS encountered Avila during a traffic stop, during which he admitted that he had entered the country illegally and lacked documents authorizing his admission. DHS then arrested Avila, and on the same day, it initiated removal proceedings against him by issuing a Notice to Appear, charging him with removability under 8 U.S.C. § 1182(a)(6)(A)(i), (a)(7)(A)(i)(I) for being an alien present in the United States without being admitted and lacking valid entry documentation. DHS detained Avila without bond while it brought removal proceedings against him. Avila requested a bond redetermination

hearing before an immigration judge, who denied his request. Avila then filed a habeas petition in the district court seeking his immediate release or a bond hearing under 8 U.S.C. § 1226(a).

The district court granted Avila's petition. Central to its decision was 8 U.S.C. § 1225(b)(2)(A), which authorizes detention without bond for "an alien who is an applicant for admission, if . . . an alien seeking admission is not clearly and beyond a doubt entitled to be admitted." The district court concluded that this provision did not apply to Avila because he "ha[d] lived in the country for years without seeking any lawful immigration status, such as naturalization, asylum, [or] refugee designation," and thus he was not "seeking admission" under the statute. The district court also concluded that § 1225(b)(2)(A) was not applicable to aliens present in the United States because it would render portions of the Laken Riley Act, 8 U.S.C. § 1226(c), superfluous. Thus, holding that Avila was not subject to mandatory detention under § 1225(b)(2)(A) but rather was entitled to a bond hearing under § 1226(a), the district court granted Avila's habeas petition, ordering the Government to release Avila or conduct a bond hearing within seven days. The Government subsequently provided Avila with a bond redetermination hearing, and he was released on $7,500 bond. This appeal followed.

## II.

"On appeal from a district court's grant of a habeas petition, we review the district court's findings of fact for clear error, and its conclusions of law de novo." Finch v. Payne, 983 F.3d 973, 978 (8th Cir. 2020) (citation omitted). "We review questions of statutory interpretation de novo[.]" Mader v. United States, 654 F.3d 794, 800 (8th Cir. 2011) (en banc).

This case concerns the scope of the Government's power to detain aliens under 8 U.S.C. § 1225. Section 1225 works in multiple parts. First, § 1225(a)(1) specifies that the statute applies to an alien who is an "applicant for admission." In defining this term, § 1225(a)(1) reads as follows:

An alien present in the United States who has not been admitted or who arrives in the United States . . . shall be deemed for purposes of this chapter an applicant for admission.

Being "admitted" does not merely mean being present in the United States; under immigration law, it signifies having made a lawful entry into the country. See 8 U.S.C. § 1101(a)(13)(A) ("The terms 'admission' and 'admitted' mean, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer.").

Next, § 1225(b)(2)(A) describes the Government's power to detain "applicant[s] for admission." It reads:

[I]n the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien *seeking admission* is not clearly and beyond a doubt entitled to be admitted, the alien *shall be detained* for a proceeding under section 1229a of this title.

Id. (emphases added). Unlike "applicant for admission," the phrase "seeking admission" is not defined in the statute. See id. Thus, taking § 1225(a)(1) and (b)(2)(A) together, the central inquiry is whether an alien who is an "applicant for admission" is also "seeking admission" under § 1225(b)(2)(A). If the phrases are equivalent, then, generally, any "alien present in the United States who has not been admitted" "shall be detained."[2] Id. § 1225(a)(1), (b)(2)(A). On the other hand, if the phrases are not equivalent, then an alien is only subject to detention under § 1225(b)(2)(A) if he or she is present in the country without being admitted and also engages in a separate act of "seeking admission," whatever that may be.

---

[2]There is a narrow, discretionary exception to mandatory detention under § 1225(b)(2)(A) in 8 U.S.C. § 1182(d)(5)(A). "But DHS may only use this authority 'on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'" Buenrostro-Mendez v. Bondi, 166 F.4th 494, 499 n.3 (5th Cir. 2026) (citation omitted).

Here, Avila does not contest that he has not been lawfully admitted into the country and thus remains an "applicant for admission." However, he argues that he is not subject to detention under § 1225(b)(2)(A) because, according to him, an alien only "seek[s] admission" under the statute when he takes an "affirmative action" to obtain admission into the country—not when he is merely present in the country without having been admitted.

We have not yet addressed whether the terms "applicant for admission" and "seeking admission" in § 1225(b)(2)(A) are equivalent. The Seventh Circuit, discussing the issue in the preliminary injunction context, has rejected this interpretation of the statute on the grounds that it "would render . . . the phrase 'seeking admission' superfluous." Castañon-Nava v. U.S. Dep't of Homeland Sec., 161 F.4th 1048, 1061 (7th Cir. 2025).[3] On the other hand, the Fifth Circuit has concluded that "an applicant for admission to the United States is 'seeking admission' to the same, regardless whether the person actively engages in further affirmative acts to gain admission." Buenrostro-Mendez v. Bondi, 166 F.4th 494, 502 (5th Cir. 2026).

When interpreting a statute, we "begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." Morales v. Trans World Airlines, Inc., 504 U.S. 374, 383 (1992) (citation omitted). Here, we agree with the Fifth Circuit that the ordinary meanings of the phrases "applicant for admission" and "seeking admission" are the same. See Buenrostro-Mendez, 166 F.4th at 502. "'[A]pply' means '[t]o make a formal request,'" while "'seek' means 'to request, ask for.'" Id. (quoting Webster's New World College Dictionary 69, 1299 (4th ed. 1999)). Thus, "[w]hen a person applies for something, they are necessarily seeking it." Id. "Just as an applicant to a college seeks admission, an applicant for admission to the United

_____

[3]Castañon-Nava dealt with an order enjoining DHS from making warrantless arrests of aliens, which is not the issue here. See 161 F.4th at 1052. However, the court there discussed the Government's power to detain aliens under § 1225(b)(2)(A) because it was one of the Government's defenses to the injunction. Id. at 1060-62.

-5-

States is 'seeking admission' to the same, regardless whether the person actively engages in further affirmative acts to gain admission." Id.

Avila argues that "seeking admission" can only refer to someone taking "present-tense, affirmative action" to obtain lawful entry into the country because "seeking" is a present-tense word. But "[i]t would make no sense to say that as soon as [a college] applicant clicks 'submit' on [his] application, [he] is no longer [presently] seeking admission, merely because [he] does not take any further affirmative steps to gain admittance. Instead, [he] would . . . be seeking admission as long as [his] application is pending." Id. So too here, while an alien remains an "applicant for admission" so long as he is "present in the United States [and] has not been admitted," 8 U.S.C. § 1225(a)(1), he is also "presently seeking admission" during this time, regardless of whether he takes "any further affirmative steps to gain admittance," Buenrostro-Mendez, 166 F.4th at 502.

Not only do the similar meanings of "applicant for admission" and "seeking admission" demonstrate that they are equivalent, but the grammatical structure of the statute does too. See 8 U.S.C. § 1225(b)(2)(A). Generally, when a statute lists a phrase as a distinct condition for the occurrence of another event, it will use clauses with words like "if" and "and" to show that it is required. See, e.g., United States v. Morales, 122 F.4th 590, 594 (5th Cir. 2024) (noting that the word "and" can "connect[] several provisions that all must be met"). For example, if someone says, "I will buy the car if it is inexpensive and reliable," there are clearly two conditions for buying the car—being "inexpensive" and "reliable." On the other hand, if an "if" clause does not emphasize a secondary phrase and has no conjunctive term like "and" or "as well as," this indicates that it only has one condition.

Here, the structure of § 1225(b)(2)(A) does not indicate that "seeking admission" is a separate requirement for detention under the statute. As § 1225(b)(2)(A) states, an applicant for admission must be detained "if the examining immigration officer determines that an alien seeking admission is not clearly . . . entitled to be admitted." Avila wants us to read this "if" clause and find that there are two conditions for detention—one pertaining to "seeking

-6-

admission" and one pertaining to the alien's entitlement to admission. But this reading is highly unnatural because there is no word like "and" to signify that there are multiple conditions in the clause; the only relevant inquiry is whether an alien "is [or is] not clearly . . . entitled to be admitted." Id.

If Congress wanted to make clear that "seeking admission" was an independent requirement in the statute, it could have easily done so. For example, if § 1225(b)(2)(A) mandated the detention of an alien "if the examining immigration officer determines that an alien [*is*] seeking admission [*and*] is not clearly . . . entitled to be admitted," it would be clear that "seeking admission" is a standalone requirement. The presence of the word "and" would indicate that "seeking admission" is an additional requirement for detention on par with the alien being "not clearly . . . entitled to be admitted." Id. However, because the text does not place such emphasis on "seeking admission," and since the phrase means virtually the same thing as "applicant for admission," in the context of the statute the two phrases are synonymous.[4] See id.

Thus, Avila's argument that the Government's interpretation renders the phrase "seeking admission" superfluous is unconvincing. Since the structure of the text does not indicate that this phrase has standalone meaning, merely using it as a synonym for something else does not make it surplusage. See Tyler v. Cain, 533 U.S. 656, 664 (2001) ("Congress, needless to say, is permitted to use synonyms in a statute."); Hibbs v. Winn, 542 U.S. 88, 101 (2004) ("The rule against superfluities complements the principle that courts are to interpret the words of a statute in context."). "Redundancy is not a silver bullet[,]" particularly where the supposedly superfluous phrase is not given any independent weight by the text. Rimini St., Inc. v. Oracle USA, Inc., 586 U.S. 334, 346 (2019).

---

[4]Even if the two phrases could somehow be construed as having distinct meanings, the statutory context constrains and limits any distinction to a level of irrelevance. This is made evident in the plain language of 8 U.S.C. § 1225(a)(3), which says that "[a]ll aliens . . . who are applicants for admission *or otherwise seeking admission . . .* shall be inspected by immigration officers." (emphasis added); see also Buenrostro-Mendez, 166 F.4th at 503 ("The use of 'or otherwise' suggests that 'applicants for admission' are a subset of those 'seeking admission.'").

Avila also asserts that "applicant for admission" is a term of art with special meaning, but this argument is similarly unavailing. Because the text does not indicate that "seeking admission" and "applicant for admission" are different, they still mean the same thing even if "applicant for admission" is a term of art. In other words, just as an alien is an "applicant for admission" even though no literal "application" is filed, so too is an alien "seeking admission" even when the alien does not literally "request" or "ask for" admission into the country. See Buenrostro-Mendez, 166 F.4th at 502 (citation omitted).

Other provisions in § 1225 also indicate that "seeking admission" mirrors the term-of-art meaning of "applicant for admission." Section 1225(b)(2)(B), for example, exempts "stowaway[s]" from mandatory detention under § 1225(b)(2)(A); a "stowaway" is defined as "any alien who obtains transportation without the consent of the owner . . . through concealment aboard such vessel or aircraft." 8 U.S.C. § 1101(a)(49). But if Avila is right that "seeking admission" only refers to aliens who are taking "present-tense, affirmative action" to gain lawful entry into the country, why would an exception be needed for stowaways, who are unquestionably not doing so? The obvious explanation is that an alien who is a stowaway can nonetheless be "seeking admission" because, like an "applicant for admission," an alien "seek[s] admission" under the statute simply by being "present in the United States" while having "not been admitted." Id. § 1225(a)(1).

The statutory purpose of § 1225 also supports the Government's interpretation of the text. As other courts have observed, Congress enacted § 1225(a)(1) to "ensure[] that all immigrants who have not been lawfully admitted, regardless of their physical presence in the country, are placed on equal footing in removal proceedings." Torres v. Barr, 976 F.3d 918, 928 (9th Cir. 2020); see also Buenrostro-Mendez, 166 F.4th at 508; H.R. Rep. No. 104-469, pt. 1, at 225 (1996) (explaining that § 1225(a)(1) was "intended to replace certain aspects of the current 'entry doctrine,' under which illegal aliens who have entered the United States without inspection gain equities and privileges . . . that are not available to aliens who present themselves for inspection at a port of entry"). Here, Avila "has lived in the country for years without seeking any lawful immigration status, such as

-8-

naturalization, asylum, [or] refugee designation." But under Avila's interpretation of the statute, he would be entitled to receive a bond hearing, even though aliens who "seek[] admission" by actively engaging with the legal process would not be. Because this outcome is incongruous and contradicts the statute's goal of placing all aliens "on equal footing," it cuts against Avila's reading of the statute. Torres, 976 F.3d at 928. While ultimately "Congress's purpose matters far less than what it wrote," the purpose here nevertheless "confirms what the statutory text already makes clear," which is that § 1225(b)(2)(A) mandates the detention of unadmitted aliens already present inside the United States. Buenrostro-Mendez, 166 F.4th at 508.

Avila responds that the Supreme Court's opinion in Jennings v. Rodriguez, 583 U.S. 281 (2018), interpreted § 1225 to apply to aliens detained at the border and § 1226 to aliens detained in the interior. But this characterization was offered only as general background information, as the Court there was not confronted with the interpretive issue now before us.[5] See id. at 287-89; see also Nat'l Pork Producers Council v. Ross, 598 U.S. 356, 373-74 (2023) ("'[T]he language of an opinion is not always to be parsed . . . [like the] language of a statute.' Instead . . . [it] must be read with a careful eye to context." (first alteration in original) (citation omitted)). Thus, "[a]lthough we give Supreme Court dicta more weight than other judicial dicta . . . it is not binding." Dahle v. Kijakazi, 62 F.4th 424, 428 (8th Cir. 2023). Moreover, Jennings does not preclude the application of § 1225 to aliens arrested in the interior. See 583 U.S. at 289. While Jennings states that § 1226 generally authorizes the Government to detain "certain aliens already in the country," id., this does not preclude other statutory provisions—such as § 1225(b)(2)(A)—from also applying

---

[5]The dissent also contends that our decision in United States v. Castellanos, 518 F.3d 965 (8th Cir. 2008), interpreted the phrase "seeking admission" to apply only to aliens at the border. But Castellanos dealt with a different statute than here—one that does not generally apply to any alien who is "present in the United States who has not been admitted" as stated in § 1225(a)(1)—and that case did not involve immigration proceedings. 518 F.3d at 968-69; see also United States v. McNeive, 536 F.2d 1245, 1250 (8th Cir. 1976) ("[G]eneral statements, standing alone, are not necessarily controlling and must be considered in the proper context of the opinion in which they appear.").

to such aliens, see Buenrostro-Mendez, 166 F.4th at 505; 8 U.S.C. § 1225(a)(1) (defining "applicant for admission" to include "alien[s] present in the United States").

Avila next argues that the limited application of § 1225 by prior administrations implies that § 1225 is limited to the border. But the statutory text squarely contradicts this notion, as § 1225(a)(1) defines an applicant for admission as "[a]n alien present in the United States who has not been admitted *or who arrives* in the United States." (emphasis added). In distinguishing an alien "who has not been admitted" from one "who arrives," the text makes clear that it applies to aliens in the nation's interior as well as at the border. Thus, even if previous administrations did not exercise their full authority under § 1225, the "[a]uthority granted by Congress . . . cannot evaporate through lack of administrative exercise," as "the mere failure of [an] administrative agenc[y] to act is in no sense 'a binding administrative interpretation' that the Government lacks the authority to act." Bankamerica Corp. v. United States, 462 U.S. 122, 131 (1983) (first and second alterations in original) (citations omitted); see also Buenrostro-Mendez, 166 F.4th at 506 ("[The fact] that prior Administrations decided to use less than their full enforcement authority under § 1225(b)(2)(A) does not mean they lacked the authority to do more."). Thus, neither Jennings nor the Government's history of enforcing § 1225 confines the Government's authority to detain aliens under § 1225(b)(2)(A) to the border.

Avila further argues that § 1225 cannot apply to aliens in the interior because it would render superfluous the Laken Riley Act, § 1226(c), which authorizes detention without bond for aliens who commit certain offenses (such as violent crimes). But Avila overlooks that § 1226(c) applies both to aliens who have not yet been admitted—i.e., "applicants for admission"—as well as those who were previously admitted but have lost their legal status since—such as aliens who have overstayed their visas. See Buenrostro-Mendez, 166 F.4th at 505. Furthermore, "[n]ot only does § 1226(c) sweep in deportable aliens in addition to the inadmissible aliens covered by § 1225(b)(2)(A), [but] it also eliminates the option of parole [under 8 U.S.C. § 1182(d)(5)(A)] for those to whom it applies." Id. Thus, because

§ 1226(c) applies a different set of penalties to a broader group of aliens than § 1225(b)(2)(A) does, the latter does not render the former surplusage. In any case, to the extent that the Laken Riley Act overlaps with § 1225, "[r]edundancy in one portion of a statute is not a license to rewrite or eviscerate another portion of the statute contrary to its text." Barton v. Barr, 590 U.S. 222, 239 (2020). Because § 1225(b)(2)(A) broadly applies to any alien who is "seeking admission," and because, as established earlier, the text is clear that this phrase is synonymous with "applicant for admission," any overlap between § 1225(b)(2)(A) and the Laken Riley Act is just that—overlap. And because Congress passed the Laken Riley Act "at a time when the Executive was still declining to exercise its full enforcement authority [under § 1225]," Buenrostro-Mendez, 166 F.4th at 505, it is entirely reasonable that the overlap between §§ 1225(b)(2)(A) and 1226(c) is a result of Congress's effort to be "doubly sure" to deny parole to aliens who have committed certain offenses, Barton, 590 U.S. at 239.

Lastly, Avila contends that the legislative history supports his interpretation of § 1225. Avila notes that Congress delayed the implementation of § 1226(c) due to its concern over the Government's capacity to detain an additional 45,000 aliens under the provision, but it did not similarly delay the implementation of § 1225(b)(2)(A), which, under the Government's interpretation, would apply to even more aliens. Because this would be an inexplicable discrepancy, Avila argues, Congress must not have believed that § 1225 applied to aliens arrested in the interior.

However, Avila's argument is unconvincing because "it is never our job to rewrite . . . statutory text under the banner of speculation about what Congress might have done." Garland v. Cargill, 602 U.S. 406, 428 (2024) (alteration in original) (citation omitted). Here, "Congress could have declined to delay implementation of § 1225(b)(2)(A) for any number of reasons." Buenrostro-Mendez, 166 F.4th at 507-08. Moreover, "legislative history is not the law," and "[w]e do not inquire what the legislature meant; we ask only what the statute means." Epic Sys. Corp. v. Lewis, 584 U.S. 497, 523 (2018) (alteration in original) (citation omitted). Because the text here is clear that an "applicant for admission" is also an alien who is "seeking admission," see § 1225(a)(1), (b)(2)(A),

-11-

we may not "resort to legislative history to cloud a statutory text that is clear," Cont'l Res., Inc. v. N. Dakota Bd. of Univ. & Sch. Lands, 136 F.4th 778, 785 (8th Cir. 2025) (citation omitted). Accordingly, we find that the district court erred in holding that the Government could not detain Avila without bond under § 1225(b)(2)(A) and in granting habeas relief on that basis.

## III.

For the foregoing reasons, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

ERICKSON, Circuit Judge, dissenting.

Except for a single DUI, for nearly 20 years, Joaquin Herrera Avila had been living a law-abiding life in the United States. On August 29, 2025, he was stopped by deportation officers while driving on Cedar Avenue in Minneapolis, Minnesota. For the past 29 years, Avila would have been entitled to a bond hearing during his removal proceedings. The court now holds that Avila—and millions of others—are subject to mandatory detention under 8 U.S.C. § 1225(b)(2)(A). In doing so, the court does not rely on recent Congressional action or a change in the regulations governing detention but rather engages in a novel interpretation of "alien seeking admission" that eluded the courts and five previous presidential administrations. Because the court's interpretation is not supported by the plain meaning of "seeking," the context of the INA, or the history of the IIRIRA, I respectfully dissent.

Section 1225(b)(2)(A) requires detention of "an alien seeking admission" if the "examining immigration officer" determines the person "is not clearly and beyond a doubt entitled to be admitted." The INA defines "admission" as "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(C). The INA does not define the word "seeking" or the phrase "seeking admission." Dictionaries define "seek" to mean "to ask for" or "to try to acquire or gain." *Seek*, Merriam-Webster's Unabridged Dictionary, https://unabridged.merriam-webster.com/unabridged/seek. As a present

participle, "seeking" typically expresses present action. Applying the ordinary meaning of the word "seeking" and the statutory definition of "admission," § 1225(b)(2)(A) applies to aliens presently trying to gain lawful entry into the United States after inspection and authorization by an immigration officer. Avila does not meet these elements.

To get to its desired result, the court uses the statutory definition to deem Avila an "applicant for admission," and then turns around and uses the ordinary meaning of the same phrase to find he is also "seeking admission" when he is not.[6] Contrary to the court's analysis, "applicant for admission" and "seeking admission" are not coterminous phrases. While the court's interpretation renders "seeking admission" superfluous, Avila's interpretation gives effect to every word in § 1225(b)(2)(A) by applying only when an alien is both (1) an "applicant for admission" and (2) actually seeking admission. Although the canon against surplusage is not a "silver bullet," Congress went out of its way to include the phrase "seeking admission." And "a variation in terms suggests a variation in meaning." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 170 (2012). Congress could have accomplished the court's reading with less words and more clarity by omitting "seeking admission," but it did not. See Biden v. Texas, 597 U.S. 785 (2022) ("If Congress had wanted the provision to have that effect, it could have said so in words far simpler than those that it wrote.").

Notably, the court's atextual reading cannot be reconciled with either the context within the INA or the history of the IIRIRA. Before the IIRIRA, an alien who arrived at a port of arrival was placed in "exclusion proceedings," 8 U.S.C. § 1225 (1995), but an alien who entered the United States without inspection was placed in "deportation proceedings," 8 U.S.C. § 1252 (1995). "As a result, non-citizens who had entered without inspection could take advantage of the greater

---

[6]Section 1225(b)(2)(B)'s exemption for "stowaways" as relied on by the court is not useful because a stowaway could conceal himself while in transport and then seek admission once reaching the United States. Regardless, a stowaway is not an applicant for admission, 8 U.S.C. § 1225(a)(2), and all agree that § 1225(b)(2)(A) only applies to applicants for admission.

procedural and substantive rights afforded in deportation proceedings, while non-citizens who actually presented themselves to authorities for inspection were restrained by more summary exclusion proceedings." Martinez v. Att'y Gen., 693 F.3d 408, 413 n.5 (3d Cir. 2012). "To remedy this unintended and undesirable consequence, the IIRIRA substituted 'admission' for 'entry,' and replaced deportation and exclusion proceedings with the more general 'removal' proceeding." Id. Both noncitizens who enter without inspection and noncitizens who present themselves are now subject to removal on grounds of inadmissibility while noncitizens who have been admitted are subject to removal on grounds of deportability. 8 U.S.C. § 1229a. Unadmitted noncitizens bear the burden of proving they are not inadmissible whereas the government bears the burden of showing an admitted noncitizen is deportable. 8 U.S.C. § 1229a.

Before the IIRIRA, unadmitted noncitizens apprehended in the interior were eligible for bond pending deportation, 8 U.S.C. § 1252 (1995), whereas noncitizens appearing at a port of arrival were subject to mandatory detention, 8 U.S.C. § 1225(b) (1995). The IIRIRA maintained this distinction as evidenced by Congress's use of "seeking admission" and § 1225's title, which continues to refer to "Inspection by immigration officers" and "expedited removal of inadmissible arriving aliens." Yates v. United States, 574 U.S. 528, 540 (2015) ("While these headings are not commanding, they supply cues" of what Congress intended.).

Conversely, bond eligibility under § 1226(a) broadly applies to "aliens."[7] Tellingly, the § 1226(c) exceptions to bond eligibility apply to noncitizens who are either deportable or inadmissible. For example, § 1226(c)(1)(A) excepts "any alien who . . . is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title." The Laken Riley Act added an exception to bond

---

[7]Bond eligibility under § 1226(a)'s predecessor applied "[p]ending a determination of deportability." 8 U.S.C. § 1252 (1995). Congress could have retained that language in § 1226 and made it clear that § 1226 only applies to noncitizens subject to removal on deportability grounds. Instead, Congress changed that language to provide for bond eligibility for deportable and inadmissible "pending a decision on whether the alien is to be removed."

eligibility specifically for inadmissible aliens that entered without inspection, like Avila. 8 U.S.C. § 1226(c)(1)(E)(i). The court's holding that mandatory detention applies to all inadmissible noncitizens renders those exceptions superfluous. Buenrostro-Mendez v. Bondi, 166 F.4th 494, 518 (5th Cir. 2026) (Douglas, J., dissenting) ("[E]xceptions referring to inadmissible noncitizens, would have been largely unnecessary if all inadmissible noncitizens were already subject to mandatory detention without a bond hearing under § 1225(b)(2)(A)."). Although the court acknowledges overlap between § 1225 and § 1226, it asserts the § 1226(c) exceptions remove the possibility of parole for those subject to mandatory detention under § 1225(b)(2)(A). But if that was Congress's only goal, then it would have done so in the section covering parole or at least in § 1225(b)(2)(A).

All three branches of government understood the IIRIRA to maintain the distinction between unadmitted noncitizens in the interior and those arriving at the border for detention purposes. Five presidential administrations, including the first Trump administration, and most immigration judges interpreted § 1225 to apply only to those arriving at the border. This conduct is something courts ought to consider. See Loper Bright Enters. v. Raimondo, 603 U.S. 369, 386 (2024) ("[T]he longstanding practice of the government—like any other interpretive aid—can inform a court's determination of what the law is.") (cleaned up). Several courts, including this Circuit, interpreted the phrase "seeking admission" as applying only to those seeking lawful entry at the border. See e.g., United States v. Castellanos, 518 F.3d 965, 971 (8th Cir. 2008) (interpreting "seeking admission" in 8 U.S.C. § 1357 as pertaining to circumstances where individuals are attempting to enter the United States). The fact that Congress never attempted to correct the other two branches is also worthy of consideration. See Zemel v. Rusk, 381 U.S. 1, 11 (1965) (noting Congress's failure to repeal or revise constitutes persuasive evidence that the interpretation is the one Congress intended). When Congress enacted the Laken Riley Act, it acted with the understanding that § 1226(a) applied to at least some inadmissible noncitizens. This comported with Congress's decision when it passed the IIRIRA to authorize deferred implementation of § 1226(c) for two years while the agency increased its detention capacity, IIRIRA § 303(b), while making no such provision for implementation of § 1225(b)(2).

-15-

Despite the well-established understanding and application of § 1225(b)(2), the court reaches a different result, pointing to the perverse incentive it creates. But as the Supreme Court has recognized, "[t]he distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law" because "once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." Zadyvdas v. Davis, 533 U.S. 678, 693 (2001).[8] "[G]overnment intrusions have always been tolerated at the border that would be intolerable in the interior, for the obvious reason that citizens and noncitizens alike expect to be able to go about their business without having to show that they are 'clearly and beyond doubt entitled to be admitted' if taken, or mistaken, for an otherwise inadmissible noncitizen." Buenrostro-Mendez, 166 F.4th at 519 (Douglas, J., dissenting).

I respectfully dissent and would affirm the judgment of the district court.

_____

---

[8]After the Fifth Circuit's decision in Buenrostro-Mendez, multiple district courts in the Fifth Circuit have granted similar habeas petitions on due process grounds. See, e.g., Alvarez-Rico v. Noem, Case No. 4:26-CV-00729, 2026 WL 522322 (S.D. Tex. Feb. 25, 2026).